# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

HUGH PATRICK POBUR
an individual, and CARIN POBUR,
an individual

      Plaintiffs,

vs.

JOSHUA L. GOTTLIEB, an individual,
and THE GOTTLIEB ORGANIZATION, LLC,
a Delaware limited liability company,

      Defendants.

Case No. 2:26-cv-11606
Hon.
Mag.

JURY TRIAL DEMANDED

---

## COMPLAINT

---

> There is a civil action between these parties arising out of the same or similar transaction or occurrence pending in this Court before the Honorable Judith E. Levy, Case No. 26-cv-10351.

1

Plaintiffs Hugh Patrick Pobur and Carin Pobur (together the "Poburs" or "Plaintiffs"), by their attorneys, Stinar Lannen, PLLC, for their Complaint, state:

## INTRODUCTION

1.    This is a lawsuit for breach of fiduciary duty, negligent misrepresentation, and unjust enrichment in connection with the marketing, sale, and management by Defendants of a defective premium-financed indexed universal life insurance program that was issued for the benefit of Hugh and Carin Pobur.

2.    The Poburs purchased universal life insurance products using premium financing in 2015. As a result, at that time, they had approximately $15 million in life insurance coverage and other investment benefits. They used a broker other than Defendants for these products.

3.    To obtain the coverage, they paid $1,000,000 per year into accounts for the life insurance policies and related investment products ($650,000 earmarked to Hugh and $350,000 to Carin).

4.    The funds for those payments were provided in large part from loans from a third-party lender over the course of seven years, at almost exactly $1,000,000 per year.

5.    The Poburs were directly or indirectly responsible for paying interest only on the yearly loans until the cash values of the life insurance policies were sufficient to pay down the loans while still generating wealth.

6.      The premium financing life insurance strategy is typically used by high-net-worth individuals as part of estate planning.

7.      After four years of paying into their premium-financed policies, the Poburs were approached by Defendant Joshua Gottlieb. Gottlieb held himself out as "a nationally renowned expert in life insurance (notably in the so-called 'Premium Finance' arena"). He told the Poburs that they had been duped by their prior broker and that he could help them, but that their only option was to "blow up" their current policies and start anew with him.

8.      The Poburs believed Gottlieb (who represented himself and his company as an expert), surrendered their policies, and bought what ended up being nearly identical policies through Defendants, who received significant commissions.

9.      Defendants, however, did not explain the dangers of their plans and the Poburs soon found themselves unable to afford Gottlieb's plans due to outrageously increasing interest rates and other costs that Gottlieb misrepresented were not risks.

10.     When these risks materialized, Gottlieb, afraid he would lose his more than $300,000 in commissions, paid the Poburs' premiums out of his own pocket until he received his commissions. Once he received his commissions, Gottlieb tried to sell the Poburs some new investments. When they declined, he ceased all communications with them.

11. The third-party lender foreclosed on the cash value of the life insurance policies, and the Poburs have lost over $600,000 in fees and costs, more than $16 Million in coverage, plus related investments, and now, due to health issues, they can no longer obtain the insurance they once had.

## PARTIES

12. Plaintiff Hugh Patrick Pobur is a Michigan Citizen, domiciled in Michigan, and residing in Oakland County, Michigan.

13. Plaintiff Carin Pobur is a Michigan Citizen, domiciled in Michigan, and residing in Oakland County, Michigan.

14. Defendant Joshua L. Gottlieb is an insurance broker who sells life insurance through The Gottlieb Organization. Gottlieb is, and at all relevant times has been, domiciled in and a citizen of the State of Ohio.

15. Defendant The Gottlieb Organization ("TGO") is a Delaware limited liability company with its principal place of business in Ohio. Gottlieb is the sole member of TGO, and thus TGO is a citizen of Ohio.

## JURISDICTION AND VENUE

16. This Court has diversity citizenship jurisdiction under 28 U.S.C. § 1332(a)(1), because this matter is a civil action where the amount in controversy exceeds $75,000, exclusive of interest and costs, and it is between citizens of different states.

17. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district and Plaintiffs are residents of this district in Michigan.

18. Defendants have traveled to Michigan repeatedly including predominantly in this district to meet with Plaintiffs.

19. Defendants have had hundreds of phone calls and communications with Plaintiffs.

20. This Court has personal jurisdiction over Defendants because, among other reasons, Defendants have conducted business activities in Michigan; and Plaintiffs' claims in this action relate to Defendants' conduct and activities in Michigan.

21. Additionally, Gottlieb is a licensed Michigan insurance producer; and Gottlieb, through TGO, has sold life insurance products in Michigan, including, but not limited to, the insurance products sold to Plaintiffs.

## STATEMENT OF FACTS

### The Lincoln Policies

22. In June 2015, Plaintiffs purchased universal life insurance policies from Lincoln Financial Group ("Lincoln Policies" or individually "Lincoln Policy") through a broker from Entaire Global One ("Global One").

23. Global One was purchased by Synovus Bank in 2016.

24.     The Lincoln Policies provided $10,000,000 in death benefits for Hugh Pobur and just under $5,600,000 in death benefits for Carin Pobur, along with other investment benefits.

25.     Plaintiffs purchased the Lincoln Policies using a strategy called premium financing.

26.      Premium financing is a method where a third-party lender provides a loan to a client to pay for large insurance premiums, such as for life insurance, allowing the client to avoid large upfront cash outlays or liquidating other investments.

27.     Using premium financing, instead of paying the full premium all at once, the client pays installments to the lender.

28.     The loan is often secured by the policy itself, its cash value, or other assets serving as collateral.

29.     The Poburs, through their business, agreed to borrow $1,000,000 per year for seven consecutive years from Global One.

30.     The loans were then used to pay the $1,000,000 yearly premiums on the Lincoln Policies, $650,000 for Hugh's Policy and $350,000 for Carin's Policy.

31.     The loans were interest only.

32.     The Poburs paid the Lincoln Policies' premiums for more than three years when they were approached by Joshua Gottlieb and an attorney Bob Boesiger.

6

**Joshua Gottlieb's Tandem Plan**

33.   In November 2018, Boesiger advised the Poburs to have his colleague, Joshua Gottlieb, review the Lincoln Policies.

34.   Gottlieb holds himself out as "a nationally renowned expert in life insurance (notably in the so-called 'Premium Finance' arena").

35.   In actuality, Gottlieb is a former securities broker barred by the Financial Industry Regulatory Authority ("FINRA") since 2017.

36.   On May 3, 2017, Gottlieb voluntarily accepted a lifetime ban from FINRA membership by signing an Acceptance, Waiver, and Consent, No. 2015044606802 ("AWC").

37.   The AWC states that the FINRA investigation began in March 2015 and involved private securities transactions away from his broker-dealer firm, Benefit Funding. Gottlieb actively participated in the investigation and even sat for a deposition. Gottlieb then stopped cooperating with the investigation and accepted a lifetime ban.

38.   The Poburs were unaware of Gottlieb's lifetime ban from FINRA until recently.

39.   Gottlieb represented to the Poburs that the Lincoln Policies that were established by the prior broker had significant problems and were "disastrous" for the Poburs.

7

40. According to Gottlieb, the Lincoln Policies had features reducing wealth generation and highly risky projections.

41. For example, Gottlieb stated that the Lincoln Policies have a "return of premium" feature that gives the client the right to surrender the policy(ies) at any time during the first 10 policy years and receive back 100% of the premiums paid in the form of enhanced cash surrender values.

42. Gottlieb stated that it is a great feature, but very costly and pulls down the ability for a policy to experience cash value growth to be optimized.

43. He said that the Poburs were not getting the tax deductions they were promised under the Lincoln Policies.

44. He said that the Poburs' Lincoln Policies were giant tax evasion vehicles with dangers around every corner, including by the use of reciprocal trusts to hold the Lincoln Policies.

45. Critically, Gottlieb said, the Poburs' company was on the hook for the disastrous Lincoln Policies and could be seized by the lender.

46. Gottlieb said that with his proposed policies (the "Tandem Plan"), using the same premium financing structure, he could provide greater security and wealth building than the Lincoln Policies and without risk to the Poburs' business.

47. Gottlieb recommended to the Poburs to "blow up the current plan" and start anew.

48. Gottlieb's Tandem Plan used the same strategy as the Lincoln Policies –indexed life insurance policies to be the cash accumulation vehicles and borrowing to finance a meaningful portion of the premium.

49. Gottlieb recommended a premium financing loan through BankDirect Capital Finance to an entity created by the Poburs, CHP Family Holdings, LLC.

50. CHP Family Holdings, LLC borrowed $2,500,000 from BankDirect to make the Tandem Plan premium payments.

51. The BankDirect loan was secured by the Tandem Plan insurance policies' guaranteed cash surrender value.

52. The BankDirect Loan had an applicable interest rate of 4.44% for the initial interest period. Thereafter, the per annum rate equaled the LIBOR Rate plus 180 basis points, but at no time would the applicable interest rate be less than 3.85%.

53. According to Gottlieb, the Tandem Plan was guaranteed and included investment technology that presents a very attractive element to their portfolio (Pacific Life for Hugh and Minnesota Life for Carin). The survivorship policy was guaranteed to grow the cash value in a highly efficient manner. And having three different investment technologies within the three policies provides, he stated, provided the Poburs with a desirable diversification in their portfolio that does not exist today.

54. He called this format the "Tandem Financial Strategy."

9

55.     The Tandem Financial Strategy would lower the death benefit and lower the yearly contributions to $285,000 a year for the next eleven years, which he said was much less than the Poburs' anticipated contributions to the Lincoln Policies which would soon be as high as $500,000 a year.

56.     Gottlieb promised he would change the reciprocal trust component of the Lincoln Policies to LLCs, which would hold the policies.

57.     Gottlieb knew that commissions are typically calculated based on the amount of the annual premiums in the first few years immediately following the sale of new policies.

58.     Therefore, he could maximize his return by convincing Plaintiffs to purchase policies with the highest annual premiums they could afford in the short term.

**Interest Rates**

59.     Interest rates spiked dramatically throughout 2022 and into 2023. The BSBY 12-month rate increased from 0.49871% on January 5, 2022, to 5.39% on November 1, 2022. This caused the realized interest rate of the loan that was secured by the Poburs' policies to also increase dramatically, far beyond what Gottlieb both represented and guaranteed repeatedly on dozens if not hundreds of occasions.

60.     The interest rate increase caused the spread between the S&P indexing of the Gottlieb Policy and the interest owed on the premium financing loan to

disappear and actually invert. Simply put, the entire concept of the Tandem Plan – that the return on the Index would more than cover the cost of lending – vanished.

61. Gottlieb never discussed with the Poburs the risk that rising interest rates would have on the Tandem Plan.

62. Gottlieb never disclosed to the Poburs that rising interest rates would stress the Tandem Plan to the breaking point and would result in the premium financier to foreclose on the Gottlieb Policies.

63. Gottlieb both individually and through his entity failed to illustrate any risks with his sales pitches.

64. Gottlieb and the rest of the GTO team had a reason for telling the Poburs whatever they needed to hear to invest in the Gottlieb Policies because the Policies paid Defendants over $300,000 in commissions, including thousands of additional dollars on a go forward basis.

65. Gottlieb, Boesiger, and the GTO team had a substantial financial incentive to cause the Poburs to pay for an elaborate Tandem Plan without providing them with any realistic projections or disclosures of risk.

66. The Poburs paid hundreds of thousands out of pocket for Gottlieb's Tandem Plan investment, for nothing. The Poburs had over $15 million in life insurance that Gottlieb convinced them to surrender in favor of his Tandem Plan which vanished.

67.     The Poburs contributed $25,000 per month to fund the Tandem Plan. The amount of these contributions varied throughout the years, but the Poburs continued making contributions in reliance on Defendants' representations that the Tandem Plan was sound and performing as expected.

68.     The Poburs made ongoing monthly contributions as late as June 12, 2023 for Gottlieb's Tandem Plan investment.

69.     The Poburs made these payments in addition to the hundreds of thousands of dollars the Poburs paid in premiums and related costs for Gottlieb's Tandem Plan.

70.     Throughout the period in which the Poburs made these contributions, Hugh Pobur made multiple calls to Gottlieb to confirm receipt of the funds and to ensure the bank had processed the transactions. On each occasion, either Gottlieb or a member of his staff at TGO confirmed that the funds had been received.

71.     In June 2023, and again in July 2023, Hugh Pobur contacted Gottlieb to inquire about the status of his contributions and the Tandem Plan. Despite having confirmed receipt of the Poburs' funds on numerous occasions, Gottlieb failed to provide any meaningful response to these inquiries and ultimately ceased substantive communication with the Poburs regarding their investments.

72.     Hugh Pobur is now functionally uninsurable due to his age and recent heath issues, making it difficult if not impossible to obtain insurance. The success of

the Tandem Plan that was represented to the Poburs by Defendants was a done deal so long as the Poburs kept up with their end of the bargain, which they did.

73. Gottlieb represented that he had "worked tirelessly w little relative remuneration" for the Poburs.

74. That was totally false. Gottlieb made hundreds of thousands of dollars off of the Poburs, and then convinced them to *further* invest in Gottlieb's own "alternative" investments, such as an energy farm, for tens of thousands of dollars more, all of which has been lost.

75. Gottlieb even represented that he could get the Poburs an 18% tax shelter by selling some of their annuities, which they owned wholly apart from the life insurance products.

76. Gottlieb stated, "I want you in this as it's a great opportunity and I dint [sic] have many paths to help you win.  This is low hanging fruit I get to use to help you."

### Defendants Owed Specific Duties to Plaintiffs

77. Under Michigan law, a special relationship exists between an insurance broker and the broker's client. This special relationship is a fiduciary relationship, and it extends as well to the intended beneficiaries of the policies to be procured.

78. Under Michigan law, an insurance broker who agrees to procure insurance for another for a fee owes a fiduciary duty to exercise reasonable skill and

13

care in obtaining that insurance, and in this case, also included related "investment" products.

79.   Under Michigan law, an insurance broker also owes a fiduciary duty of care to advise as to the risks and benefits of the policies requested.

80.   Gottlieb held himself out as a "nationally renowned expert in life insurance," specifically in "Premium Finance arena."

81.   Gottlieb offered advice to the Poburs about the inadequacies of the Lincoln Policies and the "rock-solid investment" into the Tandem Plan.

82.   Gottlieb failed to disclose the risk that rising interest rates would have on the Tandem Plan.

83.   Defendants' wrongful conduct as alleged herein was not a discrete, one-time act or omission. Rather, Defendants engaged in a continuous and unbroken course of wrongful conduct spanning from approximately November 2018 through at least 2023 and continuing thereafter until the lender's foreclosure on the Tandem Plan policies and Defendants' ultimate abandonment of Plaintiffs.

84.   Defendants actively concealed their wrongful conduct from Plaintiffs by, among other things, (a) making ongoing representations that the Tandem Plan was performing as expected; (b) confirming receipt of Plaintiffs' monthly contributions without disclosing that the Plan was failing; and (c) failing to disclose the lender's default notices or other indicators of the Tandem Plan's distress.

Defendants' fraudulent concealment tolled the statute of limitations under MCL 600.5855.

## COUNT I – BREACH OF FIDUCIARY DUTY

85.    Plaintiffs incorporate by reference the preceding allegations as if fully repeated.

86.    On more than ten occasions from 2015 and through present time, in person, over the phone, and via web-based video calls, Defendants represented themselves as experts in the field of insurance and retirement planning and further represented that their expertise was specialized and beyond the knowledge and understanding of other financial and insurance advisors.

87.    There existed a fiduciary relationship between the Poburs and Defendants, who acted as the Poburs' insurance agent for the purpose of obtaining premium financed life insurance coverage.

88.    As a licensed insurance producer, Defendants acted in a fiduciary capacity and, thus, also owed Plaintiffs a heightened duty of care.

89.    As fiduciaries, Defendants owed the Poburs a duty of loyalty and were required to act in their best interests.

90.    As fiduciaries, Defendants owed the Poburs the duty to exercise reasonable skill and care in marketing and selling the Tandem Plan.

91.     As fiduciaries, Defendants owed the Poburs the duty to exercise reasonable skill and care in designing the Tandem Plan that was consistent with their instructions, limitations, and goals.

92.     As fiduciaries, Defendants owed the Poburs a duty to exercise reasonable skill and care in providing advice regarding the performance of the Tandem Plan.

93.     Each of the foregoing acts and omissions constituted an independent breach of Defendants' fiduciary duties. Because Defendants continued to breach their fiduciary duties through at least 2023, including by making affirmative misrepresentations within the three-year limitations period prescribed by MCL 600.5805(10) and by abandoning Plaintiffs without fulfilling their continuing duty to advise, actionable breaches occurred within the applicable statute of limitations.

94.     Defendants' fiduciary duties to Plaintiffs did not terminate upon the initial sale of the Tandem Plan policies. As Plaintiffs' insurance broker and fiduciary, Defendants owed Plaintiffs a continuing duty to monitor, manage, and advise regarding the performance of the Tandem Plan, and to disclose all material information bearing upon the Tandem Plan's viability and the Poburs' financial interests.

95.     Defendants breached the duties they owed to Plaintiffs by, among other acts and omissions, the following:

(i)     advising and inducing the Poburs to abandon their existing policies and investments in favor of Defendants' Tandem Plan;

(ii)    advising and inducing the Poburs to incur substantial debt and pledge valuable assets as collateral to implement and finance Defendants' Tandem Plan;

(iii)   failing to properly manage and service the Tandem Plan by, among other things, failing to secure affordable premium financing to pay the annual premiums;

(iv)    repeatedly misrepresenting to Plaintiffs that the Tandem Plan was "working," and there was no reason for concern;

(v)     marketing, selling, and designing a defective Tandem Plan that was not consistent with the Poburs' instructions, limitations, and goals; and

(vi)    consistently placing the interests of themselves over the Poburs, including by paying (from their own funds) just enough of the premiums to earn a substantial commission, and then letting the policies lapse, so that Plaintiffs received no benefits, Defendants made hundreds of thousands of dollars, plus convinced the Poburs to invest in other of Defendants' entities, all of which

17

investments have returned $0 or been lost, and now leaving Plaintiffs uninsured.

96. The Poburs relied upon Defendants' judgment and advice as to placement and sufficiency of coverage.

97. Defendants knew or should have known that the Tandem Plan was defective and that it would fail.

98. Defendants breached their fiduciary duties by failing to advise the Poburs of the defects of the Tandem Plan.

99. Defendants further breach their fiduciary duties to advise the Poburs concerning the performance of the Tandem Plan when they falsely stated that the program was performing as expected and even performing better than anticipated, lulling the Poburs into continuing to make contributions to the Tandem Plan.

100. Defendants' breaches were either knowing and intentional, or reckless.

101. As a direct result of Defendants' breaches, the Poburs have suffered, and continue to suffer, substantial financial harm.

102. Additionally, a duty of good faith and loyalty was created as a result of the special relationship of trust between Defendants and the Poburs, as stated below:

    (i)    Defendants held themselves out as a specialist in procuring life insurance to the Poburs;

(ii)    The Poburs advised Defendants that they were not informed about this type of insurance and were relying on him to provide insurance to fully cover their needs;

(iii)   The Poburs asked Defendants to explain the extent of coverage and how it was better than what he currently had;

(iv)    Defendants responded to the Poburs that the policy covered "all of risks, yet provided real wealth," without providing or explaining the true costs and the real risks, all of which soon materialized; and

(v)     Defendants acted as the Poburs' investment manager for other investments based on knowingly false projections that have caused further injury.

103.    The special relationship was also created by Defendants' assumption of an additional duty by express agreement with the Poburs, because:

(i)     Defendants promised the Poburs that they would procure better and more affordable life insurance coverage than they currently had at the time Defendants originated the new life insurance products;

19

(ii)   Defendants were made aware that the Poburs did not fully understand the life insurance coverage and were relying upon Defendants' expertise in procuring insurance to meet their needs;

(iii)   Defendants held themselves out as specialists in the field of procuring life insurance, and assumed the duty to seek additional information required to ascertain and/or determine the Poburs' needs and desired coverage; and

(iv)   Defendants further assumed the duty to explain all costs contained in the Tandem Plan procured by Defendants.

104.   As a result of Defendants' breaches of their duties outlined in the preceding paragraphs, the Poburs have been damaged in the sum certain of $16,000,000.00, exclusive of attorney fees and/or costs.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter an Order and Judgment against Defendants:

A.   Awarding Plaintiffs damages against Defendants, jointly and severally, in the sum certain of $16,000,000.00, exclusive of attorney fees and/or costs;

B.   Awarding any other relief in favor of Plaintiffs the Court deems equitable and appropriate under the circumstances, including their costs, attorneys' fees, and prejudgment interest.

## COUNT II – NEGLIGENT MISREPRESENTATION; ERRORS AND OMISSIONS OF AN INSURANCE AGENT

105.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if set forth fully herein.

106.   A special relationship exists between insurance brokers and their clients, as well as the intended beneficiaries of the policy.

107.   Non-gratuitous suppliers of information owe a duty to their clients and intended third-party beneficiaries to exercise reasonable care to avoid misrepresenting facts.

108.   Defendants owed the Poburs a duty to exercise reasonable care regarding the representations they made in connection with the Tandem Plan.

109.   Defendants' negligent misrepresentations were not limited to a single communication or a discrete moment in time. Rather, Defendants made a series of ongoing, successive negligent misrepresentations to Plaintiffs over a period spanning from approximately late 2018 through at least 2023.

110.   Defendants made false representations regarding the Tandem Plan, including that it was designed to be consistent with the Poburs' instructions, limitations, and goals, as well as how the program functioned.

111.   Defendants made false representations that the Tandem Plan was outperforming expectations or performing as expected for years. When issues arose with the Tandem Plan, Defendants misrepresented their intent and ability to address

the issues and fix them, as opposed to explaining the reality to the Poburs that the Tandem Plan had failed and was never designed to succeed.

112. The Poburs relied on Defendants' misrepresentations when they, among other things, agreed to purchase the Tandem Plan Policies, pay $50,000 per year to fund the Tandem Plan, agreed to borrow hundreds of thousands per year to pay the premiums if the interest was controlled, and agreed to surrender the valuable Lincoln Policies.

113. At all relevant times, Gottlieb was employed as a, and the sole owner of, life insurance advisor and agent of TGO.

114. As an employee/agent of TGO, TGO held Gottlieb out as a specialist in obtaining life insurance with premium financing.

115. Gottlieb's actions were authorized by and performed in the course and scope of his employment and agency with TGO, to the financial benefit of Defendants.

116. TGO knew or should have known that the Poburs would rely on the representations of its employee, Gottlieb.

117. TGO fostered and promoted the special relationship that existed between the Poburs and Gottlieb.

118. TGO is vicariously liable for the breach of Gottlieb's duties to the Poburs.

22

119.   Defendants owed a duty of care to Plaintiffs as non-gratuitous suppliers of information, and each successive negligent misrepresentation constituted an independent breach of that duty.  Because Defendants continued to make negligent misrepresentations through at least 2023, including representations made after the dramatic spike in interest rates throughout 2022 that the Tandem Plan remained viable and was performing well, actionable misrepresentations occurred well within the six-year limitations period prescribed by MCL 600.5813.

120.   As a direct and proximate result of Defendants' ongoing misrepresentations and wrongful omissions, the Poburs suffered damages, and continue to suffer financial harm.

**WHEREFORE**, Plaintiffs, respectfully request that this Court enter an Order and Judgment against Defendants Joshua L. Gottlieb, and The Gottlieb Organization, LLC, jointly and severally, in the sum certain of $16,000,000.00, exclusive of attorney fees and/or costs.

### COUNT III – FRAUD

121.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if set forth fully herein.

122.   Defendants made misrepresentations to the Poburs to induce them to liquidate their existing Lincoln Policies and investments and invest those monies in Defendants' Tandem Plan, make additional initial contributions to Defendants'

Tandem Plan, and borrow substantial monies and pledge valuable assets to implement and facilitate Defendants' Tandem Plan.

123. Gottlieb, through TGO, made the statement that the Poburs had been duped by their prior broker and that he could help them, but that their only option was to "blow up" their current Lincoln Policies, which Defendants stated were "disastrous" for the Poburs, and start anew with Defendants.

124. Defendants made the statement to the Poburs that they were not getting the tax deductions they were promised under the Lincoln Policies.

125. Defendants told the Poburs that the Lincoln Policies were giant tax evasion vehicles with dangers around every corner, including by the use of reciprocal trusts to hold the Lincoln Policies.

126. Gottlieb, through TGO, made the statement that the Poburs' company was on the hook for the disastrous Lincoln Policies and could be seized by the lender.

127. Defendants stated that if the Poburs went with the Tandem Plan, using the same premium financing structure, Defendants provide greater security and wealth building than the Lincoln Policies and without risk to the Poburs' business.

128. The Poburs believed Gottlieb, through TGO (who represented himself and his company as an expert), surrendered their policies, and bought what ended up being nearly identical policies through Defendants, who received significant commissions.

24

129.    Defendants representations were false, misleading, and made to induce the Poburs to abandon their existing Lincoln Policies and entrust their financial well-being to Defendants.

130.    Defendants represented to the Poburs that the Tandem Plan was a risk-free strategy that contained features that are guaranteed to generate wealth and provide financial security without exposure to adverse market conditions, rising interest rates, or other financial risks.

131.    Defendants repeatedly assured the Poburs that the Tandem Plan was "rock-solid" and their investments were safe, when in fact Defendants knew or should have known that the Tandem Plan carried substantial risks, including the risk that rising interest rates would undermine the financial assumptions upon which the Plan was premised. These misrepresentations were false at the time they were made by Defendants to the Poburs.

132.    Defendants knew the misrepresentations were false at the time they made them to the Poburs.

133.    Defendants knew that the Poburs were relying on the misrepresentations and made them to induce the Poburs to liquidate existing policies and investments and invest those monies in Defendants' Tandem Plan, make additional initial contributions to Defendants' Tandem Plan, and borrow substantial

monies and pledge valuable assets to implement and facilitate Defendants' Tandem Plan.

134. Defendants also concealed and failed to disclose material facts they had a duty to disclose to the Poburs because of their superior knowledge of those facts and the importance of those facts.

135. Defendants perpetrated a continuing fraud upon Plaintiffs spanning from approximately November 2018 through at least 2023, through a pattern of repeated, knowing misrepresentations and active concealment of material facts.

136. Among them, Defendants concealed and/or failed to disclose the following:

(i) Defendants were not experts in the field of life insurance with premium financing;

(ii) their knowledge and level of management and service was not unparalleled;

(iii) they would not provide the Poburs with a sufficient level of attention, oversight, and care;

(iv) their Tandem Plan would not provide the Poburs with annual retirement income or substantial death benefits for their heirs;

(v) they would not secure premium financing on favorable terms or facilitate and ensure the payment of the annual premiums;

(vi)   premium financing was not being secured, the annual premiums were not being paid, their Tandem Plan was not "working," and there was reason for concern;

(vii)   they were not addressing the notices and letters issued by the insurance carrier and/or the premium finance lenders;

(viii)   they were not deferring renewal dates for strategic advantage; and

(ix)   liquidating the Poburs' existing portfolio valued at $16,000,000 and investing it in Defendants' Tandem Plan would not be financially advantageous to the Poburs.

137.   Defendants made the misrepresentations and omissions with the intent that the Poburs would rely upon them and to induce the Poburs to liquidate existing policies and investments and invest those monies in Defendants' Tandem Plan, make additional initial contributions to Defendants' Tandem Plan, and borrow substantial monies and pledge valuable assets to implement and facilitate Defendants' Tandem Plan.

138.   Plaintiffs reasonably and justifiably relied on the misrepresentations and omissions in, among other ways, liquidating existing policies and investments and investing those monies in Defendants' Tandem Plan, making additional initial contributions to Defendants' Tandem Plan, borrowing substantial monies and

pledging valuable assets to implement and facilitate Defendants' Tandem Plan, foregoing payment of annual premiums directly or through other means, and foregoing other investment opportunities.

139.    Had Plaintiffs known that these misrepresentations were false or Defendants had disclosed the facts they concealed and/or omitted, they would not have liquidated existing policies and investments and invested those monies in Defendants' Tandem Plan, made additional initial contributions to Defendants' Tandem Plan, borrowed substantial monies and pledged valuable assets to implement and facilitate Defendants' Tandem Plan, forewent payment of annual premiums directly or through other means, or forewent other investment opportunities.

140.    As a result of these fraudulent acts, Plaintiffs have suffered, and will continue to suffer, substantial financial harm.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter an Order and Judgment against Defendants in the amount of $16,000,000:

A.      Awarding Plaintiffs their damages against Defendants in an appropriate amount to be determined by the Court;

B.      Awarding any other relief in favor of Plaintiffs the Court deems equitable and appropriate under the circumstances, including its costs, attorneys' fees, and prejudgment interest.

## COUNT IV - UNJUST ENRICHMENT

141.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if set forth fully herein.

142.   Defendants made representations concerning the Tandem Plan to the Poburs for the purpose of obtaining financial consideration.

143.   Defendants' representations were false and the Poburs agreed to purchase the Tandem Plan Policies as part of the Tandem Plan because of those false representations.

144.   Specifically, Defendants received financial benefits unjustly and inequitably on a continuing basis, including but not limited to: (i) commissions paid to Defendants in connection with the Tandem Plan policies, including trailing and renewal commissions paid on a go-forward basis; (ii) fees and financial consideration received from Plaintiffs in connection with other investments into which Defendants induced Plaintiffs to invest, including but not limited to the "energy farm" investment and other "alternative" investments promoted by Gottlieb; and (iii) financial benefits received by Defendants as a result of Plaintiffs' continued contributions and premium payments to the Tandem Plan, which Defendants induced through ongoing misrepresentations about the plan's viability.

145. It would be unjust and inequitable for Defendants to retain the benefits that they gained through their misrepresentations and inequitable conduct, including but not limited to, commissions.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter an Order and Judgment against Defendants:

A. Awarding Plaintiffs their damages against Defendants in an appropriate amount to be determined by the Court;

B. Awarding any other relief in favor of Plaintiffs the Court deems equitable and appropriate under the circumstances, including its costs, attorneys' fees, and prejudgment interest.

Dated: May 15, 2026                    Respectfully Submitted,

*/s/ Patrick Lannen*
Patrick Lannen (P73031)
Erik Johnson (P85017)
Brooke Seely (P86293)
**STINAR LANNEN, PLLC**
280 West Maple, Suite 230
Birmingham, MI 48009
Office: (248) 565-2690
Patrick@stinarlannenlaw.com
Erik@StinarLannenLaw.com
Brooke@StinarLannenLaw.com